# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CLINTON BROWN, JR.,          :
                                    :

          Plaintiff,         :
                                      :

          v.              :      C.A. No. 10-813-LPS
                                      :

MICHAEL J. ASTRUE,         :
Commissioner of Social Security,  :
                                      :

          Defendant.     :
                                      :

---

Gary L. Smith, Esquire, GARY L. SMITH ATTORNEY AT LAW, Newark, DE.

      Attorney for Plaintiff.

Charles M. Oberly, III, Esquire, United States Attorney and Dina White Griffin, Esquire
OFFICE OF THE UNITED STATES ATTORNEY, Wilmington, DE.

Eric P. Kressman, Esquire and Tara A. Czekaj, SOCIAL SECURITY ADMINISTRATION -
REGION III OFFICE OF GENERAL COUNSEL, Philadelphia, PA.

      Attorneys for Defendant.

---

## MEMORANDUM OPINION

April 4, 2012
Wilmington, Delaware

**STARK, U.S. District Judge:**

## I. INTRODUCTION

Plaintiff, Clinton Brown, Jr. ("Brown" or "Plaintiff"), appeals from a decision of defendant, Michael J. Astrue, the Commissioner of Social Security ("Commissioner" or "Defendant"), denying his application for disability insurance benefits ("DIB") and supplemental social security income ("SSI") under Title II and Title XVII of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-433, 1381-1383f. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

Presently pending before the Court are cross-motions for summary judgment filed by Brown and the Commissioner. (D.I. 14, 17) Brown asks the Court to reverse Defendant's decision and order an award of benefits. (D.I 15 at 19) Defendant requests that the Court affirm his decision to deny benefits. (D.I. 18 at 24) For the reasons set forth below, Plaintiff's motion will be granted in part and the Commissioner's motion will be denied. This matter will be remanded to the Commissioner for further findings and/or proceedings consistent with this Memorandum Opinion.

## II. BACKGROUND

### A. Procedural History

Plaintiff filed his application for DIB and SSI on August 22, 2007, alleging disability since July 31, 2007 due to heart problems. (D.I. 11 (hereinafter "Tr.") at 97, 105, 134) Plaintiff's claims for DIB and SSI were denied initially and upon reconsideration. (Tr. 57, 62) Thereafter, Plaintiff requested a hearing before an administrative law judge ("ALJ"). (Tr. 8, 72-73) A hearing was held on September 10, 2009 before ALJ Judith A. Showalter, at which

1

Plaintiff was represented by counsel. (Tr. 8) Plaintiff and a vocational expert testified at the

hearing. *(See* Tr. 20-52) On October 19, 2009, the ALJ issued a written decision in which she

found that Plaintiff was not disabled as defined in the Act. (Tr. 17) Plaintiff requested review of

the ALJ's decision, and the Appeals Council denied Plaintiff's request for review on July 29,

2010. (Tr. 1) Thus, the October 19, 2009 decision of ALJ Showalter became the final decision

of the Commissioner. *See* 20 C.F.R. §§ 404.955, 404.981; *Sims v. Apfel*, 530 U.S. 103, 107

(2000).

On September 23, 2010, Brown filed a complaint seeking judicial review of the ALJ's

October 19, 2009 decision. (D.I. 2) On May 25, 2011, Brown moved for summary judgment.

(D.I. 14) In response, on June 24, 2011, the Commissioner filed a cross-motion for summary

judgment. (D.I. 17)

## B. Factual Background

### 1. Brown's Medical History, Treatment, and Conditions

Plaintiff was thirty-seven years old on his alleged disability onset date and was considered

a younger individual for disability determination purposes. *See* 20 C.F.R. § 404.963(c); Tr. 10,

16. Plaintiff has a twelfth-grade education. (Tr. 16, 139) He has previous work experience as a

cook, tree laborer, masonry laborer, and mason. (Tr. 16, 25-27, 135, 156) In his application for

DIB and SSI, Plaintiff contended that his heart problems were the cause of his disability. (Tr. 97,

105, 134) Plaintiff's relevant medical history is detailed below.

Plaintiff was hospitalized for five days beginning on July 31, 2007 and was diagnosed

with ventricular tachycardia ("VT") with secondary diagnoses of acute renal failure, non-

ischemic cardiomyopathy, and cocaine abuse. (Tr. 198-200, 203, 209, 269) Laboratory testing

2

revealed an elevated creatinine function level and an elevated random glucose level, which were attributed to stress hyperglycemia. (Tr. 199-200) A drug screen from the emergency room tested positive for cocaine and benzodiazepines. (Tr. 198, 212, 217, 245) An echocardiogram revealed a global impairment in the left ventricular systolic function with an estimated ejection fraction of approximately thirty-five percent and intact valvular structures. (Tr. 242-43) Roger Kerzner, M.D., performed a cardiac catheterization that revealed non-ischemic cardiomyopathy, but no significant epicardial coronary artery disease. (Tr. 203, 257) Consequently, Dr. Kerzner implanted a cardioverter-defibrillator ("ICD") and advised Plaintiff of increased risks associated with continued cocaine use. (Tr. 203, 251-53, 266-67, 269)

On August 28, 2007, Plaintiff informed Dr. Kerzner that he was a construction worker and often had to do heavy lifting. (Tr. 273) Dr. Kerzner opined that Plaintiff would have to decrease his work strain and limit himself to light construction work. (Tr. 273) He indicated Plaintiff could return to work in one month. (Tr. 273) He also noted that Plaintiff experienced short-term memory loss from a 1992 car accident. (Tr. 273)

At an August 31, 2007 follow-up visit, Plaintiff reported that he was doing ok but was experiencing orthopnea (shortness of breath) and minimal pedal edema (leg or ankle swelling). (Tr. 276) Plaintiff stated he was able to climb a set a stairs without difficulty, palpitations, or syncope. (Tr. 276) Dr. Kerzner felt Plaintiff's ICD incisions were healing well, despite Plaintiff's report of incisional discomfort. (Tr. 276) Dr. Kerzner diagnosed Plaintiff with non-ischemic cardiomyopathy, congestive heart failure ("CHF"), and sustained VT status post ICD implant likely secondary to cocaine use. (Tr. 276) Dr. Kerzner indicated that Plaintiff had chronic systolic heart failure and was currently New York Heart Association ("NYHA") Class

3

II[1]; accordingly, he modified Plaintiffs medications and referred Plaintiff to cardiac rehabilitation. (Tr. 276-77) Dr. Kerzner also noted that Plaintiff experienced memory loss as a result of a head injury. (Tr. 276-77) Dr. Kerzner provided a letter to Plaintiff, which stated that Plaintiff should "no longer work in his previous occupation due to this condition." (Tr. 278)

At a follow-up visit in September 2007, Plaintiff reported that he had recently been treated in the emergency room for dizziness and dyspnea, but that since the emergency room visit he was feeling better. (Tr. 291) Plaintiff reported significant orthopnea and pedal edema, headaches, and orthostatic dizziness. (Tr. 291) Plaintiff stated that he was able to climb a set of stairs without difficulty and had no palpitations or syncope. (Tr. 291) Plaintiff continued to report incisional discomfort from his ICD, but Dr. Kerzner noted that the incision site was improving and healing well. (Tr. 291) A physical examination revealed no abnormalities, including no edema. (Tr. 291) Dr. Kerzner's assessment remained unchanged and Plaintiff's CHF remained NYHA Class II. (Tr. 292) However, Dr. Kerzner increased Plaintiff's dosage of Lasix and prescribed Aldactone because Plaintiff was likely mildly volume overloaded. (Tr. 292) Dr. Kerzner recommended that Plaintiff check his blood pressure when he had headaches and follow-up with a neurologist. (Tr. 292)

At a December 2007 follow-up visit, Plaintiff reported "feeling better with less dyspnea with activity, less edema, [and] less orthopnea." (Tr. 295) Plaintiff stated he felt some fatigue since his Coreg dose had recently been increased, but he denied any palpitations or syncope. (Tr. 295) Plaintiff also indicated that his headaches and incisional discomfort had improved. (Tr.

---

[1]Class II indicates a patient with slight, mild limitation of activity. The patient is comfortable with rest or with mild exertion. (D.I. 18 at 4 n.2)

4

295) Dr. Kerzner's assessment was unchanged; he recommended that Plaintiff continue at the current dosage of Coreg. (Tr. 296) Dr. Kerzner instructed Plaintiff to follow-up with a nurse practitioner in one month. (Tr. 296)

Plaintiff was examined by nurse practitioner Sherri Campbell, PA-C, in January 2008. (Tr. 349) At this visit, Plaintiff complained he had intermittent left-sided chest pain off and on for the past few weeks, usually sharp and occurring at rest, but lasting only a few seconds before it resolved. (Tr. 349) Plaintiff reported that he did not experience any shocks from his ICD and did not have any chest discomfort or palpitations as a result of exertion. (Tr. 349) Plaintiff further reported continued dyspnea when walking long distances, but said he could walk short distances and up steps without significant dyspnea. (Tr. 349) Plaintiff denied any drug use and indicated he walked one mile per day for exercise. (Tr. 349) An electrocardiogram ("ECG") showed no significant change from a previous study. (Tr. 350) During a six-minute walk test, Plaintiff was able to walk 450 meters while maintaining ninety-eight percent oxygenation in his blood; he also experienced an increase in shortness of breath to a three (on a scale of one to ten). (Tr. 350) Nurse Campbell's assessment was non-ischemic cardiomyopathy with no evidence of fluid overload. (Tr. 350) She increased Plaintiff's dosage of Coreg and advised him to weigh himself daily. (Tr. 350)

At Plaintiff's next follow-up visit, in February 2008, Plaintiff reported a six to eight pound weight gain over a weekend, but denied any other symptoms other than some ankle swelling at the end of the day, which resolved with elevating his feet. (Tr. 351-52) Plaintiff indicated that he continued to walk one mile per day for exercise. (Tr. 351) Nurse Campbell's assessment was unchanged overall, but she did observe some mild fluid retention due to weight

5

gain. (Tr. 352) Therefore, she increased Plaintiff's dosage of Lasix and advised him about the importance of sodium restriction and daily weight checks. (Tr. 352)

In March 2008, Plaintiff returned to Dr. Kerzner for a follow-up visit, complaining of nasal congestion and slightly worse dyspnea with exertion secondary to a cold. (Tr. 353) Plaintiff also reported significant orthopnea, which he stated had been a problem for many weeks even prior to his cold. (Tr. 353) Plaintiff denied edema, chest pain, palpitations, and syncope. (Tr. 353) A physical examination revealed no abnormalities. (Tr. 353) Dr. Kerzner's assessment remained non-ischemic cardiomyopathy, CHF (NYHA Class II), and sustained VT status post ICD implant. (Tr. 353-54) Dr. Kerzner increased Plaintiff's dosage of Lasix to improve his orthopnea. (Tr. 354) The ICD remote transmission report for March 2008 indicated that there were no episodes of VT. (Tr. 356)

In June 2008, Plaintiff returned to Dr. Kerzner for a follow-up with complaints of persistent dyspnea and orthopnea, as well as some mild edema, which initially improved with an increased dose of Lasix, but subsequently returned. (Tr. 359-61) Plaintiff reported no chest pain, palpitations, or syncope. (Tr. 359) A physical examination revealed no abnormalities. (Tr. 359-60) Dr. Kerzner increased Plaintiff's Lasix dosage and opined that Plaintiff was NYHA Class II-III because he was mildly hypervolemic. (Tr. 360) The June 2008 ICD report revealed no VT events. (Tr. 358)

The following month, Plaintiff reported that his ankle swelling resolved with the increased dosage of Lasix, but that his shortness of breath seemed only "slightly better." (Tr. 372-73) Plaintiff indicated that he was still exercising by walking approximately one mile per day, but that he experienced shortness of breath when he walked uphill. (Tr. 372) A physical

6

examination revealed no abnormalities. (Tr. 373) Nurse Campbell opined that Plaintiff was NYHA Class II-III. (Tr. 360, 373) She increased Plaintiff's dosage of Coreg and advised him to return in two weeks. (Tr. 373)

At Plaintiff's August 2008 follow-up visit, he reported that he became out of breath walking up stairs, but could walk on flat surfaces without difficulty and was still walking approximately one mile per day. (Tr. 374) Additionally, he reported tolerating his increased dosage of blood pressure medication. (Tr. 374) A physical examination revealed no abnormalities. (Tr. 375) Nurse Campbell's assessment of Plaintiff was unchanged. (Tr. 375)

At his next follow-up visit, Plaintiff reported that his cough was improving and that he was tolerating all medications. (Tr. 376) A physical examination revealed no abnormalities. (Tr. 377) Nurse Campbell recommended that Plaintiff perform remote ICD transmissions because he reported some episodes of heart palpitations in the previous few weeks. (Tr. 377)

When Plaintiff returned in September 2008, he reported that his dyspnea and orthopnea were unchanged. (Tr. 379) He also reported intermittent ascites and edema that correlated with his weight increasing by three to four pounds. (Tr. 379) Plaintiff indicated that he experienced rare, brief palpitations and lightheadedness, but no syncope or chest discomfort. (Tr. 379) A physical examination revealed no abnormalities. (Tr. 380) Dr. Kerzner indicated that Plaintiff's CHF was NYHA Class II-III based upon an increased fluid level and, consequently, Dr. Kerzner recommended increasing Plaintiff's dosage of Lasix if his weight increased by three pounds or more. (Tr. 380) Further, Dr. Kerzner opined that Plaintiff had a serious chronic cardiac condition that prevented him from working and performing his previous job of masonry work. (Tr. 382)

7

At an October 2008 follow-up, Plaintiff reported taking an increased dosage of Lasix on several occasions due to a three-pound weight increase. (Tr. 383) Plaintiff stated that his weight was currently five to seven pounds more than normal. (Tr. 383) He also reported having more dyspnea with activity, especially when walking long distances. (Tr. 383) Plaintiff stated that he continued to walk approximately one mile per day. (Tr. 383) Nurse Campbell's assessment was unchanged (NYHA Class II-III), and she indicated that Plaintiff was still slightly fluid overloaded based on weight and cardiosight data (optivol). (Tr. 384) An ECG revealed that Plaintiff's left ventricle was normal in size with mild tricuspid regurgitation. (Tr. 386) Plaintiff's ejection fraction improved to forty-five to fifty percent. (Tr. 386) The October 2008 ICD transmission report revealed no VT events. (Tr. 390)

At a December 2008 follow-up visit, Plaintiff reported that his edema had improved and that his dyspnea with exertion was slightly improved. (Tr. 391) Although he recently had sharp chest pain not related to exertion or meals, he denied any dizziness or syncope. (Tr. 391) A physical examination was normal. (Tr. 391) Dr. Kerzner's assessment indicated that Plaintiff's CHF returned to NYHA Class II and, consequently, Dr. Kerzner decreased Plaintiff's dosage of Lasix. (Tr. 392) Dr. Kerzner diagnosed Plaintiff with chest pain of unclear etiology and ordered a stress test. (Tr. 392) The stress test was performed later that month and was negative, revealing that Plaintiff had a normal functional capacity, was able to exercise to 12.9 METS (eighty-two percent of his maximum predicted heart rate), and had an ejection fraction of fifty-five percent. (Tr. 395-96)

In January 2009, Plaintiff reported that he continued to experience mild dyspnea with exertion, but that his endurance was slowly improving. (Tr. 397) Plaintiff stated that although

he continued to feel sharp chest pain, the pain had improved. (Tr. 397) He denied any edema, dizziness, or syncope. (Tr. 397) A physical examination revealed no abnormalities. (Tr. 397) Dr. Kerzner's impressions were unchanged, but he noted that Plaintiff's ejection fraction had improved from thirty-five percent in July 2007 to fifty-five percent in December 2008 and that Plaintiff's left ventricular function had improved to normal. (Tr. 398) Dr. Kerzner recommended pulmonary function tests to evaluate Plaintiff's complaints of dyspnea with exertion. (Tr. 398) He also prescribed over-the-counter Prilosec for Plaintiff's chest pain. (Tr. 398) The pulmonary function study performed later that month revealed mild restrictive lung disease. (Tr. 400)

When Plaintiff returned to Dr. Kerzner in April 2009, he continued to report mild dyspnea with exertion. (Tr. 403) Plaintiff stated that his chest pain improved with Ranexa and he denied any edema, dizziness, or syncope. (Tr. 403-04) A physical examination revealed no abnormalities. (Tr. 403) Dr. Kerzner increased Plaintiff's dosage of Lasix in response to Plaintiff's complaint of an increase in abdominal girth without any weight gain. (Tr. 404) Dr. Kerzner discontinued Plaintiff's dosage of Digoxin because Plaintiff's left ventricular function had improved. (Tr. 404)

An ICD transmission report dated May 11, 2009 revealed no VT, but four brief modeswitch episodes transmitted by Plaintiff. (Tr. 406) Similarly, a May 31, 2009 report revealed no VT events, but two brief mode switch episodes transmitted by Plaintiff. (Tr. 407) A June 8, 2009 report also revealed no VT events, even though Plaintiff reported symptoms of lightheadedness. (Tr. 409)

At a July 2009 follow-up visit with Dr. Kerzner, Plaintiff reported that he continued to

9

have mild dyspnea with exertion. (Tr. 412) He also reported an episode of burning chest pain that awoke him from sleep, but stated that his chest pain was otherwise improved due to Ranexa. (Tr. 412) His abdominal girth and weight were stable. (Tr. 412) He denied edema and syncope and reported only rare dizziness. (Tr. 412) A physical examination revealed no abnormalities. (Tr. 412) Dr. Kerzner indicated that it was unclear whether Plaintiff's exertion symptoms and fatigue were cardiac-related, so he ordered an ECG. (Tr. 413) He also increased Plaintiff's dosage of Ranexa because his complaints of chest pain were not clearly cardiac. (Tr. 413) The ECG performed later that month revealed normal left ventricular systolic function with an ejection fraction of sixty percent. (Tr. 410) The left atrium was mildly dilated and there were mild pulmonary hypertension, trace mitral regurgitation, and mild tricuspid regurgitation. (Tr. 410)

The July 30, 2009 ICD transmission report revealed that Plaintiff had sent a manual transmission for a complaint of chest pain that was relieved with nitroglycerin, but never had VT treatment from his ICD to date. (Tr. 411)

### 2. Medical Source Opinions

Various medical professionals gave opinions of Plaintiff's physical and mental impairments, as detailed below.

### a. Plaintiff's Physical Impairments

In July 2009, Dr. Kerzner completed a cardiac residual functional capacity form. (*See* Tr. 367-70) In this form, Dr. Kerzner indicated that he examined Plaintiff every three to four months, and that Plaintiff had CHF and was NYHA Class II. (Tr. 367-70) Dr. Kerzner stated, "I doubt [Plaintiff] could work more than one to two hours daily" and indicated that Plaintiff was

10

incapable of even "low stress" jobs. (Tr. 369) Dr. Kerzner opined that Plaintiff could lift less

than ten pounds occasionally, stand/walk less than two hours in an eight-hour work day, sit about

two hours, and would require unscheduled breaks. (Tr. 369) Dr. Kerzner also opined that

Plaintiff would have frequent problems with attention and concentration and would be absent

more than four days per month. (Tr. 368, 370)

In December 2007, based upon a review of the medical evidence of record, M.H. Borek,

D.O., a state agency consultant, opined that Plaintiff was capable of performing work at the light

level of exertion with restrictions from balancing and concentrated exposure to extreme heat,

cold, fumes, odors, dusts, gases, poor ventilation, and hazards. (Tr. 306-12) In March 2008, a

second state agency physician, Carl Bancoff, M.D., reviewed the evidence of record and affirmed

Dr. Borek's assessment. (Tr. 344-45) Based upon a review of the medical evidence of record in

September 2008, another state agency physician, Anne Aldridge, M.D., affirmed Dr. Borek's

assessment. (Tr. 365)

### b. **Plaintiff's Mental Impairments**

In February 2008, Richard G. Ivins, Ph.D., a licensed psychologist, examined Plaintiff.

(Tr. 320-23) A mental status examination revealed that Plaintiff was fully oriented, but that he

spoke slowly and deferred to his wife regarding several points of information. (Tr. 320-21)

Plaintiff reported feeling frustrated, but his affective expression was adequate. (Tr. 320) He

denied any hallucinations, delusions, or suicidal thoughts. (Tr. 320) Plaintiff needed to be

refocused several times to stay on task. (Tr. 320) He was able to respond fairly well to the

questions asked. (Tr. 320) His verbal abstract thinking was impaired. (Tr. 320-21) His verbal

concept formation skills were also impaired. (Tr. 321) Plaintiff's general fund of information

11

and arithmetic reasoning for all operations were good. (Tr. 321) He was able to perform serial sevens, recite the alphabet, count backwards by ones, and add by fives. (Tr. 321) His memory for recent and remote material was good, but his recent past memory was quite impaired. (Tr. 321) His immediate verbal recall was normal forwards, but impaired backwards. (Tr. 321) Plaintiff reported that his concentration was "good," but his wife indicated that it was impaired. (Tr. 321) Plaintiff's impulse control was very good. (Tr. 321) Additionally, Plaintiff's social and test judgment, as well as his insight, were good. (Tr. 321)

Dr. Ivins diagnosed cognitive impairment secondary to traumatic brain injury sustained in 1991. (Tr. 320-21) He opined that Plaintiff had "moderate" (i.e. "an impairment which affects but does not preclude ability to function") limitations in the following areas: understanding, remembering, and carrying out primarily oral instructions and performing routine repetitive tasks; activities of daily living; and relating to other people. (Tr. 323-24) He also opined that Plaintiff had "moderately severe" (i.e. "an impairment which seriously affects ability to function") limitations in sustaining work performance and attendance in a normal work setting and coping with the pressures of work. (Tr. 324)

In March 2008, based upon a review of the medical evidence of record, Janet Brandon, Ph.D., opined that Plaintiff retained the mental ability to perform simple tasks. (Tr. 335, 338) A second state agency psychologist, Maurice Prout, Ph.D., who also reviewed the evidence of record in March 2008, affirmed Dr. Brandon's assessment. (Tr. 339-43) In September 2008, based upon a review of the medical evidence of record, Pedro M. Ferreira, Ph.D., a state agency psychologist, also affirmed Dr. Brandon's assessment. (Tr. 366)

12

### 3. The Administrative Hearing

Plaintiff's administrative hearing took place on September 10, 2009. (Tr. 8) Plaintiff testified at the hearing and was represented by counsel. (Tr. 8) A vocational expert also testified. (Tr. 8)

#### a. Plaintiff's Testimony

At the hearing, Plaintiff testified that he was separated from his wife and living with his aunt and thirteen-year-old daughter. (Tr. 23) Plaintiff indicated that from 2003 through 2007 he worked for his family as a mason and a mason's helper, but did not file taxes. (Tr. 25-27) He testified that the farthest he could walk was three to four blocks. (Tr. 36) He said he could only stand for "minutes." (Tr. 36) Plaintiff testified that he was advised by Dr. Kerzner not to lift any more than ten pounds, but indicated that on an average day he can lift "nothing." (Tr. 37) Although Plaintiff reported problems with short-term memory, he stated that he could remember and follow simple instructions and take his medications without reminders or assistance. (Tr. 37-38)

#### b. Vocational Expert's Testimony

A vocational expert, Jan Howard-Reed, also testified at the hearing. (*See* Tr. 46-51) Nurse Howard-Reed classified Plaintiff's past work experience as follows: (1) Plaintiff's job as a cook as light exertion level, unskilled work; (2) Plaintiff's job as a tree trimmer as light exertion level, unskilled work; (3) Plaintiff's job as a masonry laborer as very heavy exertion level, unskilled work; and (4) Plaintiff's job as a mason as heavy exertion level, unskilled work. (Tr. 46)

The ALJ asked Ms. Howard-Reed to consider a hypothetical claimant who was Plaintiff's

13

age, had an eleventh grade education, work experience as indicated by Plaintiff, who was limited

to simple, unskilled work at the light level of exertion, and who had the following non-exertional

restrictions: only occasional postural movements, but never climbing ladders, ropes, or scaffolds;

no concentrated exposure to temperature extremes, odors, dusts, gases, fumes, poor ventilation,

and hazards; and no work at a production rate pace. (Tr. 47-48) In response, the vocational

expert testified that, despite those limitations, such an individual could perform the light exertion

level positions of packer and inspector and the sedentary positions of assembler and unarmed

security guard. (Tr. 48)

### 3. The ALJ's Findings

On October 19, 2009, the ALJ issued the following findings:[2]

1.   The claimant meets the insured requirements of the Social Security
     Act through September 30, 2008.

2.   The claimant has not engaged in substantial gainful activity since
     July 31, 2007, the alleged onset date. (20 C.F.R. 404.1571 *et. seq.*,
     and 416.971 *et. seq.*)

3.   The claimant has the following severe impairments: coronary
     artery disease (CAD); and organic mental disorder (memory
     problem/brain injury). (20 C.F.R. 404.1520(c) and 416.920(c))

4.   The claimant does not have an impairment or combination of
     impairments that meets or medically equals one of the listed
     impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (20
     C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and
     416.926)

5.   After careful consideration of the entire record, the undersigned
     finds that the claimant has the residual functional capacity to
     perform light work as defined in 20 C.F.R. 404.1567(b) and

---

[2]The ALJ's factual findings have been extracted from her decision, which interspersed
factual findings and commentary. (Tr. 12-16)

14

416.967(b) except: occasional balancing, stooping, kneeling, crouching and crawling; no climbing ladders, ropes, or scaffolds; avoid hot and cold temperature extremes; avoid fumes, odors, dusts, gases, and poor ventilation; avoid hazards such as machinery and heights; no assembly line or production pace work; and limited to simple/unskilled work.

6. The claimant is unable to perform any past relevant work. (20 C.F.R. 404.1565 and 416.965)

7. The claimant was born on September 30, 1970 and was 36 years old which is defined as a younger individual age 18-49, on the alleged disability onset date. (20 C.F.R 404.1563 and 416.963)

8. The claimant has at least a 12th grade education and is able to communicate in English. (20 C.F.R. 404.1564 and 416.964)

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. (*See* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2)

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a))

11. The claimant has not been under a disability, as defined in the Social Security Act, form July 31, 2007 through the date of this decision. (20 C.F.R. 404.1520(g) and 416.920(g))

## III. LEGAL STANDARDS

### A. Motion for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine

issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 415 U.S. 574, 586 n.10 (1986). A party asserting that a fact cannot be – or, alternatively, is – genuinely disputed must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 415 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podohnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). However, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 411 U.S. 242,

16

247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 411 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

## B.    Review of the ALJ's Findings

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190. The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). However, evidence that was not submitted to the ALJ can be considered by the Appeals Council or the District Court as a basis for remanding the matter to the Commissioner for further proceedings, pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See Matthews*, 239 F.3d at 592. "Credibility determinations are the province of the ALJ and only should be

17

disturbed on review if not supported by substantial evidence." *Gonzalez v. Astrue*, 537

F. Supp. 2d 644, 657 (D. Del. 2008) (internal quotation marks omitted).

The Third Circuit has explained that:

> A single piece of evidence will not satisfy the substantiality test if
> the [Commissioner] ignores, or fails to resolve, a conflict created
> by countervailing evidence. Nor is evidence substantial if it is
> overwhelmed by other evidence – particularly certain types of
> evidence (e.g., that offered by treating physicians) – or if it really
> constitutes not evidence but mere conclusion.

*Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

Thus, the inquiry is not whether the Court would have made the same determination but,

rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d

1211, 1213 (3d Cir. 1988). Even if the reviewing Court would have decided the case differently,

it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by

substantial evidence. *See Monsour*, 806 F.2d at 1190-91.

## IV.    DISCUSSION

### A.    Disability Determination Process

Title II of the Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of insurance

benefits to persons who have contributed to the program and who suffer from a physical or

mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). Title XVI of the Act provides

for the payment of disability benefits to indigent persons under the SSI program. 42 U.S.C.

§ 1382(a). A "disability" is defined for purposes of both DIB and SSI as the inability to do any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

18

last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A),

1382c(a)(3)(A). A claimant is disabled "only if his physical or mental impairment or

impairments are of such severity that he is not only unable to do his previous work but cannot,

considering his age, education, and work experience, engage in any other kind of substantial

gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B);

*see also Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a

five-step sequential analysis. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d

422, 427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point

in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R.

§§ 404.1520(a)(4), 416.920(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any

substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating

finding of non-disability when claimant is engaged in substantial gainful activity). If the

claimant is not engaged in substantial gainful activity, step two requires the Commissioner to

determine whether the claimant is suffering from a severe impairment or a combination of

impairments that is severe. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii) (mandating finding of

non-disability when claimant's impairments are not severe), 416.920(a)(4)(ii). If the claimant's

impairments are severe, the Commissioner, at step three, compares the claimant's impairments to

a list of impairments that are presumed severe enough to preclude any gainful work. *See* 20

C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's

impairment or its equivalent matches an impairment in the listing, the claimant is presumed

disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform his past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Halter*, 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer*, 186 F.3d at 428.

If the claimant is unable to return to his past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude him from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

## B. Brown's Arguments on Appeal

Brown presents three arguments in his appeal: (1) the ALJ's determination of Brown's RFC was based on an inadequate review of the evidence; (2) the ALJ failed to properly evaluate the opinion of Dr. Ivins; and (3) the ALJ failed to include all of Brown's credibly established impairments in the hypothetical question posed to the vocational expert. The Court addresses these arguments below.

### 1. Whether the ALJ's determination of Brown's RFC was based on inadequate review of the evidence

Brown first argues that the ALJ's determination of Brown's RFC was flawed because the ALJ improperly discounted the opinion of Dr. Kerzner and did not provide an adequate explanation for doing so. (D.I. 15 at 11-15) The Commissioner responds that the ALJ properly determined Brown's RFC and properly weighed all medical evidence of record. (D.I. 18 at 17)

An ALJ is responsible for reviewing the evidence and making findings of fact and conclusions of law, including by considering opinions of both treating and non-treating physicians. *See* 20 C.F.R. § 404.1527(f)(2). The ALJ must treat medical opinions as expert opinion evidence; such opinions cannot be ignored, and the ALJ must explain the weight given to them. *See* SSR96-6p. "[T]he ALJ must make clear on the record his reasons for rejecting the opinion of a treating physician" when "the opinion of a treating physician conflicts with that of a non-treating, non-examining physician." *Brewster v. Heckler*, 786 F.2d 581, 585 (3d Cir. 1986); *see also Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) ("[T]here is a particularly acute need for some explanation by the ALJ when s/he has rejected relevant evidence or when there is conflicting probative evidence in the record.").

Here, the ALJ failed to adequately explain her basis for rejecting the opinion of Brown's treating physician, Dr. Kerzner. The ALJ listed the contents of Dr. Kerzner's RFC assessment, but then rejected this assessment with no express explanation. (*See* Tr. 14) The ALJ concluded her paragraph summarizing Dr. Kerzner's RFC assessment with the conclusory statement: "Dr. Kernzer's opinion is given little weight because it is unsupported by the medical evidence, including his own treatment notes." (Tr. 14) The ALJ then cited to "Exhibits 3F and 17F," which are the entirety of Dr. Kerzner's treatment notes (running to more than 60 pages) from July 31, 2007 through December 14, 2007 and July 1, 2008 through September 17, 2008. It may be that the ALJ's conclusion to give "little weight" to Dr. Kerzner's opinion is based on her statement elsewhere that "[t]reatment records from Dr. Kerzner indicate that since his hospitalization in July/August of 2007, the claimant's heart condition has remained stable with medication and treatment." (Tr. 13) But the Court cannot tell as the ALJ provides no explanation. It may also be that the ALJ rejected Dr. Kerzner's opinion based on the purported inconsistencies identified by Defendant in its briefing, comparing specific treatment notes with specific portions of Dr. Kerzner's opinion. (*See* D.I. 18 at 19-20) Again, the Court cannot tell.

Similarly, the ALJ failed to explain why she adopted the opinion of Dr. Borek, a state agency consultant, over the opinion of Plaintiff's treating physician. The ALJ stated that Dr. Borek's assessment "is given great weight" as it is "consistent with the medical record." (Tr. 14) Yet, the ALJ failed to account for the fact that Dr. Borek's assessment contradicts the opinion of Plaintiff's treating physician. Additionally, the ALJ did not cite or discuss any way in which Dr. Borek's assessment was consistent with the medical record.

Thus, because the ALJ failed to adequately discuss her rationale for rejecting the opinion

of Plaintiff's treating physician and accepting the contrary opinion of a state agency consultant, the ALJ's decision is not supported by substantial evidence. *See generally Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) ("A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.") (internal quotation marks omitted). Accordingly, the Court has determined that the ALJ's decision must be reversed and this case remanded for further proceedings.

## 2.   Whether the ALJ properly evaluated the opinion of Dr. Ivins

Next, Brown argues that the ALJ failed to adequately explain her rationale for rejecting Dr. Ivins's psychological assessment. (D.I. 15 at 16) The Commissioner responds that the ALJ properly weighed all medical opinion evidence. (D.I. 18 at 17)

The Court concludes that the ALJ properly evaluated Dr. Ivins's opinion and adequately explained her rationale for only partially accepting the opinion. The ALJ explained that:

> [Dr. Ivins's] opinion is accepted so far as it is consistent with the above residual function capacity. Portions of the consultative examination report, namely the section where Dr. Ivins indicates that the claimant has moderately severe impairments in sustaining work performance and attendance in a normal work setting and coping with the pressures of ordinary work, overstate the claimant's limitations and are inconsistent with the medical evidence of record.

(Tr. 15)

The ALJ explicitly linked her rejection of portions of Dr. Ivins's opinion to the ALJ's own factual findings incorporated in the RFC. Further, in rejecting Dr. Ivins's opinion, the ALJ

23

relied on other medical evidence – namely, the psychiatric review of Dr. Brandon, which was affirmed by two other state agency consultants and supported by the medical evidence in the record. Thus, the ALJ properly considered Dr. Ivins's opinion and explained her reasons for not adopting it in full.

### 3. Whether the ALJ Failed to Include All of Brown's Credibly Established Limitations in the Hypothetical Question

Finally, Brown argues that the ALJ's hypothetical question was inadequate because it failed to include all of Brown's impairments. (D.I. 15 at 18) In response, the Commissioner argues that the ALJ's hypothetical question reflected all of Brown's credibly established limitations. (D.I. 18 at 22)

In order to meet the burden of production at step five of the sequential analysis, the Commissioner needs to identify at least one occupation that exists in significant numbers in the national economy that a claimant can perform. *See Craigie v. Bowen,* 835 F.2d 56, 58 (3d Cir. 1987). A vocational expert's answer to a hypothetical question can be considered substantial evidence only when the question reflects all of a claimant's impairments that are supported by the record. *See Chrupcala v. Heckler,* 829 F.2d 1269, 1276 (3d Cir. 1987). However, the ALJ need not include any impairments and limitations that are not "medically established" by the record. *See Rutherford v. Barnhart,* 399 F.3d 546, 554 (3d Cir. 2005). It is the duty of the ALJ alone to determine the claimant's limitations and RFC. *See* 20 C.F.R. §§ 404.1545, 404.1546, 416.945, 416.946.

In this case, the ALJ limited the hypothetical claimant to performing tasks that entailed a light level of exertion with no climbing. (Tr. 46) The ALJ stated that the hypothetical claimant

24

would have to avoid temperature extremes, odors, dusts gasses, poor ventilation, and hazards. (Tr. 47-48) The ALJ also limited the hypothetical claimant to simple, unskilled work, at a non-production pace. (Tr. 47-48) Based on these limitations, the vocational expert testified that there were at least four occupations that such a hypothetical claimant could perform. (Tr. 48)

Plaintiff first argues that, in the hypothetical, the ALJ failed to account for the opinions of Drs. Kerzner and Ivins. (D.I. 15 at 18) It follows from what the Court has already concluded in connection with Brown's first two arguments that the hypothetical did account for the opinion of Dr. Ivins, to the extent the ALJ found Dr. Ivins's opinion to be supported by the objective medical evidence. However, because the ALJ failed to explain adequately the basis for her rejection of Dr. Kerzner's opinion, the Court cannot at this point conclude that the hypothetical question adequately (or inadequately) accounted for Dr. Kerzner's opinion.

Next, Plaintiff asserts that the ALJ erred because she failed to include Plaintiff's symptoms – pain, angina, dyspnea, edema, lightheadedness, dizziness, or psychological impairments. (D.I. 15 at 18) However, the ALJ is required to include functional limitations arising from the impairment, not the actual impairments themselves. Here, the ALJ's hypothetical accounted for the functional limitations arising from Plaintiff's impairments. Specifically, the ALJ limited the hypothetical claimant to avoiding climbing and contact with hazards, which accounts for Plaintiff's dizziness and lightheadedness. The ALJ also limited the hypothetical claimant to light work, which adequately accounts for Plaintiff's symptoms of shortness of breath on exertion. The objective medical evidence does not support Plaintiff's claim that he suffered much from edema, as several physical examinations between March 2008 and July 2009 showed no edema (*see* Tr. 353, 397, 403-04, 412), even though between June 2008

and December 2008 he reported mild or intermittent edema (*see* Tr. 359-61, 379, 391).

Finally, Plaintiff relies on statements that the vocational expert made in response to questions from Plaintiff's counsel regarding specific limitations and diagnoses made by Dr. Ivins that the ALJ did not include in her hypothetical. (D.I. 15 at 18) Plaintiff's reliance is misplaced, however, because the ALJ was only required to include credibly established limitations supported by the record. As discussed above, the ALJ did not err in finding that some of the opinions of Dr. Ivins were not supported by the medical evidence; thus, the ALJ was not required to include Dr. Ivins's unsupported opinions or any limitation resulting therefrom in the hypothetical.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Plaintiff's motion for summary judgment. Additionally, the Court will deny the Commissioner's motion for summary judgment. The Court will remand this matter to the Commissioner for further proceedings consistent with the Memorandum Opinion. An appropriate Order follows.